# Lawrence's Estate.

*Wills—Probate — Testamentary capacity — Undue influence — Presumption—Witnesses — Burden of proof — Issue devisavit vel non.*

1. Where a proponent has made out a prima facie case, establishing the validity of a writing that is manifestly testamentary, a presumption of capacity and absence of undue influence arises.

2. A witness to a will is not required to remember details as to his signing.

3. His lack of knowledge does not detract from the probative force of the fact that he signed as a witness.

4. To exact of a subscribing witness particular knowledge as to what was talked about, or to require an interview with the proposed testator, and to demand that the witness treasure this information in his mind for weeks, months or years, is to go beyond what the law contemplates.

5. Where the evidence submitted by a proponent of a will is sufficient to make out a prima facie case of validity of the writing, the burden of proof shifts to contestant's to prove the charges in which the will is assailed.

6. Testamentary incapacity must be established by the weight of the evidence, and, generally speaking, a like rule exists when it is claimed that testator's capacity was so operated on by moral coercion, as to prevent an unrestrained exercise of faculties, or, in other words, by undue influence.

7. Where it is unquestioned that a will was duly executed, the court will not grant an issue devisavit vel non, unless it is satisfied that it would, on due consideration of the evidence as a whole, in a light most favorable to validity, reasonably reach the conclusion that the giver lacked the full and intelligent knowledge and understanding necessary to dispose properly of his worldly effects; or that the will did not express his real wishes because it was procured through influence so exerted as to destroy free agency at the time the will was made.

8. Where all the evidence fails to show by its manifest weight that the testator lacked capacity or was unduly influenced, the court should order the will probated.

9. Old age, sickness, distress, debility of body, peculiar beliefs and opinions, incapacity to do business, partial failure of memory, neither prove nor raise a presumption of incapacity.

10. It requires less business judgment to make a will than to make a gift.

11. There is no presumption of mental weakness arising from the fact that the will may seem to be unreasonable or unnatural in its provisions, or that it makes an unequal distribution among the next of kin, or gives the property to a person other than the natural recipient of testator's bounty, except where the disposition is so gross or unnatural as to give rise to presumption of insanity.

12. Unreasonable or unnatural disposition, with other evidence, may be used to prove incapacity, but, standing alone, it is insufficient.

13. Such disposition may, however, become of the utmost importance when considering the question of undue influence.

14. When a man having no mental weakness gives his property contrary to his repeatedly declared intentions or unequally among his kin, a presumption of testamentary incapacity does not follow as a matter of course, and insufficient intellect must be shown.

15. A gift to a brother, who is nearest of kin and with whom testator lived on friendly terms, is not unnatural.

16. In determining whether a very old man with apparent normal capacity was unduly influenced in making his will, the court will consider the environment in which he lived and determine whether his actions were those of a normal man.

17. Where a testator has lived a secluded life, his incapacity cannot be established by country-side reputation or talk among neighbors.

18. Where an old man who is not shown to be of extreme infirmity or mental weakness, leaves his estate to a brother, his nearest of kin, with whom he has lived on terms of friendship and independence, there is no presumption to shift the burden to the brother on the question of undue influence.

19. In such case the fact that the brother may have participated in the execution of the will, is immaterial, and this is especially so where the will in question follows the testator's views as expressed in a former will.

Argued January 11, 1926. Appeal, No. 35, Jan. T., 1926, by Mordecai Lawrence, legatee, from decree of O. C. Delaware Co., Sept. T., 1924, No. 78, refusing to award issue devisavit vel non, in estate of J. Lewis Lawrence, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Appeal from register of wills refusing to admit will to probate. Before HANNUM, P. J.

The opinion of the Supreme Court states the facts.

Appeal dismissed. Mordecai Lawrence, brother of testator and principal legatee, appealed.

*Error assigned* was, inter alia, decree, quoting it.

*A. Carson Simpson,* with him *Francis Shunk Brown, Leo Belmont* and *William C. Alexander,* for appellant. —Proponent made out a prima facie case for the validity of the will: Logan's Est., 195 Pa. 282; Novicki v. O'Mara, 280 Pa. 411.

Contestant has not shown testamentary incapacity of testator, at the time he executed this will: Graybill v. Barr, 5 Pa. 441; Werstler v. Custer, 46 Pa. 502; Wilson v. Mitchell, 101 Pa. 495; Caldwell v. Anderson, 104 Pa. 199; Morris's Est., 262 Pa. 114; Novicki v. O'Mara, 280

Pa. 411; Goss's Est., 274 Pa. 278; Snyder's Est., 279 Pa. 63; Leisey's Est., 280 Pa. 533.

Contestant has not shown that testator was unduly influenced, at the time he executed this will: Gongaware v. Donehoo, 255 Pa. 502;- White's Est., 262 Pa. 356; Morgan's Est., 219 Pa. 355; Englert v. Englert, 198 Pa. 326; Kustus v. Hager, 269 Pa. 103; Tyson's Est., 223 Pa. 596; Buechley's Est., 278 Pa. 227; Phillips' Est., 244 Pa. 35.

Under the evidence given, the court should have directed the probate of the will: Tetlow's Est., 269 Pa. 486; Goss's Est., 274 Pa. 278; Snyder's Est., 279 Pa. 63; Leisey's Est., 280 Pa. 533.

In any event, the court below should have awarded an issue: Tetlow's Est., 269 Pa. 486; Crawford v. Schooley, 217 Pa. 429; Fleming's Est., 265 Pa. 399.

*L. L. Smith,* of *Smith & Strong,* for appellees.—It is entirely competent for the court to refuse an issue to the proponent: Cross's Est., 278 Pa. 170; Tetlow's Est., 269 Pa. 486.

The evidence showed incapacity to make a will: Timmes's App., 237 Pa. 189.

While it is not essential that the will should be read to testator in the presence of the subscribing witnesses, this is because other persons may testify that the testator knew the contents of the instrument: Comb's and Hankinson's App., 105 Pa. 155; White's Est., 262 Pa. 356, 361; Kessler's Est., 221 Pa. 314.

Testimony showing the status in the community of decedent with respect to his mental capacity should be received: Brindle v. McIlvaine, 10 S. & R. 282.

The burden of proof shifted to proponent: Wilson v. Mitchell, 101 Pa. 495; Shaver v. McCarthy, 110 Pa. 339; Caldwell v. Anderson, 104 Pa. 199; Miller v. Miller, 187 Pa. 574.

OPINION BY MR. JUSTICE KEPHART, March 15, 1926:

Thomas D. Lawrence died in 1885, leaving to survive him eight children, among whom were two sons, J. Lewis and Mordecai. All were equal beneficiaries in what was known as the farm located in Delaware County. It had been in the family for many years. In fact, it is stated that the house, originally built early in 1700 and the oldest in the county, is still standing. At the time the incidents which we are about to relate occurred, these men were approximately eighty and eighty-one years of age, Mordecai being the younger. They had lived on the farm or homestead for many years, J. Lewis since birth and Mordecai, though at times away, with his brother and sister Elizabeth from 1909 until the latter died in 1915. Thereafter the brothers occupied the house, the land being under lease to others. Mordecai, the younger and more active of the two, assumed the management of the property.

The interests in the property having become quite involved owing to the various dispositions of the shares of the children who predeceased J. Lewis, these two old gentlemen, no doubt appreciating their years were drawing to a close, determined to make wills in each other's favor, selecting as alternative devisees such persons as best suited their inclination. One such will was made July, 1921, where Swartz, a tenant, was named, and another in September, 1922, naming King. The dominant thought as expressed in the wills, was to provide for the survivor. It was no doubt the same feeling that prompted the sister Elizabeth to give them a life estate, though she gave part of her personalty and the remainder of her interest in the real estate to different persons than did the two brothers.

When J. Lewis's will, of September, 1922, was presented for probate, a caveat was filed by his nieces and nephews. The court below refused to direct probate or to award an issue.

It is certain, after an exhaustive study of this record, that the decree of the court below must be reversed, since the contestants have failed to meet the burden placed on them, unless we disregard the clear mandate of this court as expressed in Phillips' Est., 244 Pa. 35, 43; Buechley's Est., 278 Pa. 227; Kustus v. Hager, 269 Pa. 103; Tetlow's Est., 269 Pa. 486; Doster's Est., 271 Pa. 68; White's Est., 262 Pa. 356; Goss's Est., 274 Pa. 278; Snyder's Est., 279 Pa. 65; Leisey's Est., 280 Pa. 533.

The will is assailed on the ground of lack of testamentary capacity and undue influence. Where the proponent has made out a prima facie case, establishing the validity of a writing that is manifestly testamentary, a presumption of capacity and absence of undue influence arises. Our first inquiry, then, is whether such prima facie validity was established. Proponent called the witnesses who subscribed it; they saw the testator sign his name, stating that he was of sound, disposing mind, memory and understanding. Though three witnesses so testified, giving a general idea as to what took place when the will was signed, it is stated, the witnesses did not "recollect the particulars of the signing and did not seem to know what testamentary capacity is." Such condition of mind is the normal state of witnesses to wills. They are not required to remember details, though it might be helpful: White's Est., 262 Pa. 356, 361. Their lack of knowledge does not detract from the probative force of the fact that they signed, as a witness, stating at the time the person whose will was witnessed was of sound disposing mind, memory and understanding. To establish this fact, the certificate attesting it may not only refresh their recollection but also may be used by them as substantive proof to establish validity. To exact of a subscribing witness particular knowledge as to what was talked about or to require an interview with the proposed testator, and to demand that the witness treasure this information in his mind

for weeks, months, or years, is to go beyond what the law contemplates. The matter must be viewed in the aspect of everyday life. Testamentary capacity is not certain of definition. There are two spheres of capacity and incapacity which are quite easily understood. There is the sphere where circumstances may throw doubt on capacity; but, with the rules laid down for our guidance, incapacity should not be predicated on desire, wishes or unmerited disappointment. To persons who do not receive what they expect under wills, every state of mind responsible for the disappointment is incapacity. The layman should be as well qualified to determine incapacity as the judge and at times both have been known to err. The evidence here submitted was ample to make out a prima facie case of validity: Logan's Est., 195 Pa. 282, 283.

The burden was then shifted to contestants to prove the charges on which the will was assailed. Testamentary incapacity must be established by the manifest weight of the evidence. Generally speaking, a like rule exists, when it is claimed that testator's capacity to make a will was so operated on by a moral coercion, as to prevent an unrestrained exercise of faculties, or, in other words, by undue influence. A mere balancing of proofs will not suffice. Where it is not questioned that a will was duly executed, before the judicial mind may condemn a person's solemn declaration, disposing of his worldly effects after death, or order it to run the gauntlet of legal inquisition, for it and its maker there to suffer from unrestrained charges and insinuations by disappointed persons (when the giver is beyond the reach of inquisitorial process), as a court it must be satisfied that it would, on due consideration of the evidence as a whole, *in a light most favorable to validity,* reasonably reach the conclusion that the giver lacked the full and intelligent knowledge and understanding necessary to dispose properly of his worldly effects; or that the will did not express his real wishes because it was procured

through influences so exerted as to destroy free agency, at the time the will was made: Tetlow's Est., supra 496. Where all the evidence fails to show by its manifest weight that the testator lacked capacity or was unduly influenced, the court should order the will probated.

Did the testator lack the capacity necessary to make a valid will? As stated in Wilson v. Mitchell, 101 Pa. 495, 502, "A man of sound mind and disposing memory is one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and the persons and objects he desires shall be the recipients of his bounty": Snyder's Est., 279 Pa. 63, 67. Old age, sickness, distress or debility of body neither prove nor raise a presumption of incapacity: Wilson v. Mitchell, supra. Nor will inability to transact business (Guarantee Trust & Safe Dep. Co. v. Waller, 240 Pa. 575), physical weakness (Thompson v. Kyner, 65 Pa. 368), or peculiar beliefs and opinions: Buchanan v. Pierie, 205 Pa. 123. Failure of memory does not prove incapacity unless it is total or so extended as to make incapacity practically certain. A testator may not be able at all times to recollect the names of persons or families of those with whom he has been intimately acquainted. He may ask idle questions and repeat himself, and yet his understanding of the ordinary transactions of his life may be sound. He may not have the strength and vigor of a man able to digest all the parts of a contract, yet he may be competent to distribute his property by will: Wilson v. Mitchell, supra. It requires less business judgment to make a will than to make a gift.

There is no presumption of mental weakness arising from the fact that the will of the testator may seem to be unreasonable or unnatural in its provisions, or that it makes an unequal distribution among the next of kin, or gives the property to a person other than the natural recipient of the testator's bounty (40 Cyc. 1019), ex-

cept where the disposition is so gross or ridiculous as to give rise to a presumption of insanity. Unreasonable or unnatural disposition, with other evidence, may be used to prove incapacity, but, standing alone, it is insufficient. Such distribution may, however, become of the utmost importance when considering the question of undue influence to which it is more closely related. Whatever may be thought of the wisdom of the maker of the will, or of the just claims of his collateral relatives upon his bounty, the internal circumstances of this will add little force to the bare allegation that he did not have disposing mind at the date of its execution.

A man may have no mental weakness or entire capacity and at the same time dispose of his property unnaturally, that is, he may give it contrary to his repeatedly declared intentions or unequally among his kin. When this is done, a presumption of testamentary incapacity does not follow as a matter of course, and insufficient intellect must be shown. The suggestion in Wilson v. Mitchell, supra, 505, and Caldwell v. Anderson, supra, 204, is not opposed to this view and the presumption there mentioned did not extend to relatives of the blood. In the present case, the disposition is to a brother. This was not unnatural or unequal in view of the circumstances.

Though the line of distinction between the rules applicable to incapacity and undue influence is ordinarily clear and well-marked, there are sometimes special circumstances wherein it becomes quite shadowy; thus, where the will attacked is made by a person of great age and infirmity, suffering from a severe affliction affecting the brain and vital powers, undue influence and incapacity may be so closely interwoven as to render it difficult, if not impossible, to separate them, when conducting a judicial inquiry (Wilson's App., 99 Pa. 545, 551), though ordinarily each depends on its own set of facts.

It is the status of this individual and his mode of life that we must consider when attempting to discover in-

capacity. We cannot form a judgment on our ideas as to what this man would have done had he lived according to the standards of ordinary social life. We must endeavor, if possible, to bring our reasoning to the environment in which he lived and determine whether his actions were those of a normal man. J. Lewis, the testator, lived a solitary life in that he had no companions except his brother and a very occasional visitor or housekeeper. Here were two old men living for the most part alone. Lewis left the habitation only at rare intervals. This seclusion may have made him uncouth in manners, and, being unmarried, he may have become unkempt in personal attire and careless about his habits. Testator never took much part in business and permitted Mordecai to handle all matters in connection with the farm. This was not unusual; the latter was the younger and more active. Lewis had some money in the bank and some shares of stock. These he looked after himself. He could not make out a personal property return. Very many people of sound mind are unable to do this. The newspapers were stopped because he did not read them. At his age the world may have been uninteresting and his mental recreation may have been secured in other ways. It is stated he was a harmless, senile old man who would sit on the porch and watch people pass by,—chewing tobacco, the juice from which he permitted at times to run over his clothing. He talked about a tree he moved years ago, and seemed to take great pride in its growth. He was much interested in and talked about his horse, but did very few things about the farm. On one of his very occasional visits to an acquaintance he remarked about the size of a lamp. (This was not unnatural; the only lamps he saw were those in his own house.) Considering that he was eighty years of age, we should not be too harsh in imposing our ideas as to what was proper for him to do. This was his life, not ours, nor the contestants'. The few people, who, at intermittent periods, saw what they

termed his silly grin and vacant stare and other circumstances, as related, were chance visitors; there is scarcely any evidence on which to base the conclusion that he had an unbalanced mind, and we are sometimes too apt to term smiles, silly grins and study, vacant stares. His brother and this horse were the only living things around; there is small wonder that he discussed them. Then he waved at passers-by. This is not an uncommon habit among the best of people; a little more of its cultivation would be better for the world. At one time, many years ago, he was lost in the woods and found along a creek. Just what was the occasion for this, or the circumstances attending it, does not appear. Even that occurrence, assuming it came from an unsound mind (and it must be an assumption for there is no evidence of it), could not be said to be the act of a man who was permanently of unbalanced mind. Great stress is laid on the fact that he lost some checks, new ones were issued which he cashed and when the former turned up, he cashed them too, but, on being requested, returned the money. This bit of evidence might show considerable capacity in some directions but no doubt he forgot about the checks he cashed. Some testimony was given as to countryside reputation or the talk among the neighbors. This is the normal talk about people who live a secluded life, but such evidence is not competent to establish incapacity: Pidcock v. Potter, 68 Pa. 342.

When we turn to the other side of the ledger, we find many, many acts clearly showing testamentary capacity. Without going into unnecessary detail, his neighbors and friends denied the story of the vacant stares and silly grins, and stated there were no indications of weak-mindedness or imbecility. People who sold him clothing, neighbors he asked to buy merchandise for him, testified that in minor business dealings he always showed understanding and a knowledge of what he was doing. He did not always follow Mordecai, but signed papers in opposi-

tion to the wishes of his brother. He was able to dress, undress and take care of himself as any other individual.

The strongest evidence of capacity are the letters in evidence, not only about his stock-holdings, but concerning the estate of his sister, lost checks, and checks wrongfully cashed. These, with the leases and deeds which he executed in conjunction with many of the contestants, make out, so far as this record is concerned, an unassailable case. From 1915 up to February 2, 1923, letters, leases and deeds passed, and the testimony as to incapacity covered this same period. Among such papers were letters from counsel representing contestants, enclosing checks and complaining about the ones wrongfully cashed. During the time these documents were executed, there was not the slightest protest from any of the parties raising the question of testator's capacity. Not merely one lease, but many, with deeds, were executed; and the witnesses and some of the parties were persons now testifying against the will. Courts cannot be blind to such conduct. See Westler v. Custer, 46 Pa. 502, 503.

The medical evidence is about evenly balanced, and if anything is stronger in proponent's favor, as, for instance that of Dr. Meriweather who examined him some time before his death. He stated Lewis had the appearance of an intelligent man, answering questions coherently and clearly, and personally gave him the entire history of his ailment.

When Mordecai appeared before the register, his examination, barring some minor matters, consisted of clear, concise, intelligible statements, well phrased and indicating he understood everything. His cross-examination did not disturb him much, and, considering his age and what the refusal of such person to directly answer some questions meant, his examination was without fault. When later summoned and placed on the stand it is small wonder, because of the character of the interrogations, that at times he became confused. Indeed,

a younger man with a stronger, well-disciplined intellect would have had difficulty answering the questions, considering the time, manner, place and circumstances attending the examination. On the whole, we view his testimony as supporting in every detail testator's capacity and a will uninfluenced by him.

One of the most significant pieces of evidence is the previous will prepared in the office of Isaac Johnson, witnessed by his stenographer and his associate, turned over to the Media Title & Trust Company. The present will followed it with the exception of the alternative devise to Swartz, and he is a witness in the present contest affirming testator's capacity to make the will. He rented the farm land for some time.

When we compare all the evidence with that submitted in Goss's Estate, supra; Snyder's Estate, supra, and Leisey's Estate, supra, where wills were sustained, we find here a much stronger case for proponent. After careful review of the record, we conclude that there was not sufficient to sustain the finding that testator lacked mental capacity to make a will. Want of capacity must be established in a positive and not a doubtful manner: Novicki v. O'Mara, 280 Pa. 411, 414.

There is no presumption in this case that would shift the burden to proponent on the question of undue influence. The rule is that "where the testator leaves a substantial part of his estate to one occupying a confidential relation, the burden is on the latter to show that no improper influence controlled the making of the will. ...... This presumption arises only when there has been proof of extreme infirmity or mental weakness": Gongaware v. Donahoo, 255 Pa. 502, 508; Phillips' Est., supra, 44, 46. Mordecai, the beneficiary, was not a fiduciary or attorney or one standing in confidential relation: Leedom v. Palmer, 274 Pa. 22, 25, 26. While there was some evidence that he handled the affairs of the farm, the letters indicate that Lewis himself looked after his personal matters. We have no evidence of extreme infirmity

or mental weakness and it may well be doubted if this presumption applies to near relatives. As stated in Caldwell v. Anderson, supra, the law is not so utterly illogical and unnatural as to regard with disfavor the presence of a brother with his aged and childless sister at the time of making the will, though he may act as her scribe, and though he may become, what might reasonably be expected, one of her principal legatees. Lewis died before Mordecai, and the alternative gift to King is of no effect; this case is viewed from the standpoint of a bequest absolute in Mordecai. That Mordecai with King secured the attorney and instructed him how to draft the wills is of no consequence; the brothers were bent on making mutual wills; the one in the Media Title & Trust Company was of like character, and there was no assurance as to which would outlive the other. We said in White's Est., 262 Pa. 356, 361, that where "the proponent is a near relative and general beneficiary thereunder, the fact that he actively participated in the preparation and execution of the will does not of itself place on him the burden of showing lack of undue influence as it would in the case of a stranger." This becomes stronger where the will follows the well-known views, feelings, and intentions as expressed by the testator in a prior will. Such a will is not an unnatural one: Morgan's Est., 219 Pa. 355, 357.

Mordecai and his brother felt that they had been treated badly in connection with the estate of Elizabeth. It must have influenced the brothers when they came to make the final disposition of their property. They may have had no good reason for it, the sister had a natural right to dispose of her own as she did, but as this feeling existed the conclusion logically resulting was the cutting out of the nieces and nephews, as they did not seem to have any claim on the brother's bounty. Even though the will made unnatural bequests this could not raise a presumption of undue influence. There is no testimony

worthy of consideration to show undue influence, testator's capacity being clearly established.

As the property now stands, Mordecai can dispose of it as he sees fit; it is highly probable, if treated fairly, he will deal equitably and justly with those of his own blood.

In Phillip's Est., supra, 43, we directed attention to the elements necessary to establish undue influence. These are totally lacking in this case. We refer again to the cases heretofore cited on these questions, and, without further discussion, hold that the evidence of undue influence was insufficient to submit to the jury, and the court was in error in reaching the conclusion that the will should not be probated. See Tetlow's Est., supra, 486.

The decree of the court below is reversed and record remitted with directions that the will be admitted to probate, at cost of appellee.