King Will.

524

Argued January 10, 1952. Before Drew, C. J., Stern, Stearne, Bell, Chidsey and Musmanno, JJ.

re-argument refused April 14, 1952.

*Edward J. Griffiths,* with him *Nelson P. Fegley* and *Henry and Griffiths,* for appellants.

*Alphonso Santangelo,* with him *Dorsey F. Boston,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, March 24, 1952:

On September 27, 1949, Abbie Abel King made her will devising and bequeathing the residue of her estate, after certain legacies unimportant for consideration here, to her niece Elsie S. Edenborn.

She died on November 1, 1949, the will was admitted to probate and letters testamentary were granted to the executrix named therein, the same Mrs. Edenborn. Five other nephews and nieces contested the will and eventually the Orphans' Court of Montgomery County heard evidence to determine whether the testatrix was of sound testamentary capacity at the time she executed the will and whether she had been subjected to undue influence by Mrs. Edenborn in the making thereof.

The Orphans' Court found that Mrs. King was not lacking in testamentary capacity and also concluded that she was not the victim of undue influence.

The contestants have appealed to this Court urging the same reasons and the facts advanced in the Court below to invalidate the will.

The record reveals that some time in 1947 Mrs. King, then being 72 years of age, fell and sustained injuries which grievously disabled her. Nerves of the spinal column were apparently damaged, preventing her from assuming an erect posture and compelling her to walk in a bent over position with the aid of a cane. Later she lost practically all locomotion and was confined to bed or chair. Multiple sclerosis added its burden of torment. She was also deprived of much of the use of her hands, and a throat affliction distorted her speech to the point often of unintelligibility. One of the witnesses, who saw her in September, 1949, testified:

"She was in a chair, she didn't sit up straight in the chair, she was partly over, and she couldn't get out of the chair herself and her hands were terribly crippled and she was physically in a terrible condition, you would never know it was the same person."

Another testified: "Q. How was her movements of body? A. Well she was very feeble and her head would fall down this way. Q. Indicating her head on her chest, chin on her chest. A. Yes, and she would battle for quite a while before she could really straighten up. Q. Before she could straighten her head? A. That's right, I have seen her head laying on her chest for a good ten minutes. Q. And what was she endeavoring to do if anything with her head? A. Well it would just get down and she couldn't just get it up."

It was also testified: "Q. Could your aunt feed herself? A. I don't believe she would be able at the last to feed herself because the last time I saw her feed herself she was very awkward."

Mrs. King's afflictions progressively enfeebled her and subjected her to great pain and suffering, and she wept considerably.

Her husband died on July 8, 1949, she now being 74 years of age, and Mrs. Edenborn, her niece, took her into her home, waited on her, watched over her and administered to her until the end.

One of the most tragic misfortunes of life is an invalided and helpless old age. It is the cause of pain and humiliation to the subject and a matter of concern, inconvenience and sometimes hardship to those who have the responsibility of caring for the person struck down by the double hammer of malady and time. Some relatives find nothing overly taxing or wearisome in caring for a stricken kinsman. Others believe themselves imposed upon.

It does happen and fortunately very often that there is one member of the family whose love for and devotion to the superannuated one is so great that he or she overlooks the tedious and unpleasant tasks associated with caring for a helpless creature.

The gratitude of the beneficiary of such attentions is usually profound. It is in these moments, when a strong and affectionate hand is extended to the victim sinking into the slough of physical pain and spiritual agony, that the rescued one is happy for the opportunity to show his appreciation. And who is to deprive him of the right to place his own evaluation on that care? Certainly any law which pretends to justice will not.

Mrs. Edenborn took up the care of Mrs. King and, as the lower Court expressed it, "there can be little doubt that Mrs. Edenborn's training as a nurse was valuable under the circumstances."

Should the fact that Mrs. Edenborn was administering comfort to her aunt in her days of pain and travail prevent her from receiving the expression of gratitude shown her by the recipient of her love and competent care?

President Judge VAN RODEN of the Orphans' Court[1] in his opinion pointed out "that there is no evidence that any other relative offered to assume the burden at the time previous to Mrs. King's death."

The contestants, through their counsel, contend that Mrs. King's physical and mental condition was such as to make her a victim of improper influence. Further, that the relationship between the testatrix and Mrs. Edenborn was a confidential one which imposed

---

[1] Of Delaware County, specially presiding in Montgomery County.

upon Mrs. Edenborn the burden of proof to show that she had not unduly influenced her aunt. Also, that all the attendant circumstances built up a substantial dispute which required submission of the issue involved to a jury.

No evidence whatsoever was presented to attack Mrs. King's mental capacity. All the testimony relied upon by appellants relates to Mrs. King's helpless physical condition alone. Old age, sickness, disability or debility of body do not raise a presumption of incapacity. *Null's Estate,* 302 Pa. 64, 153 A. 137; *Lawrence's Estate,* 286 Pa. 58, 65, 132 A. 786; *Aggas v. Munnell,* 302 Pa. 78, 152 A. 840; *Duncan's Contested Will,* 147 Pa. Superior Court 133, 23 A. 2d 357.

While Mrs. King's bodily infirmities prevented her from attending to her business affairs, no one questioned the clarity and the direction of her mind. For instance, the testimony shows how she instructed Mrs. Edenborn to summon those upon whom she wished to bestow her silverware and dishes, and supervised the distribution thereof. She wrote several letters about the time of the execution of her will which were admitted by witnesses to be intelligent and purposeful. The evidence in no way sustained appellant's contention that she was of weakened intellect; on the contrary it showed her to have been in good command of her faculties.

The appellant urges the existence of a confidential relation between testatrix and executrix because they lived together, because Mrs. Edenborn wrote checks for the decedent, possessed a power of attorney for the decedent's safety deposit box (which she never used), and contacted the attorney who wrote up the will. While it is true, as appellants' counsel points out, that a confidential relation exists when the circumstances *make it certain* that the parties do not deal on equal

terms, with one side exercising an overmastering influence over the other, *Kees v. Green*, 365 Pa. 368, 75 A. 2d 602; *Shook v. Bergstrasser*, 356 Pa. 167, 170, 51 A. 2d 681; *Hamberg v. Barsky*, 355 Pa. 462, 50 A. 2d 345, we cannot agree with his conclusion that an application of that rule resulted in a finding of confidential relation in this case.

As was stated in *Leedom et al. v. Palmer et ux.*, 274 Pa. 22, 117 A. 410, "While the brother, Leedom, at times was ill, and may at times have been dependent on appellees, the element of confidential relation was wholly lacking in all their dealings. Dependency does not necessarily beget a confidential relation,—indeed, it may be quite the reverse."

But even if it were conceded that a confidential relation existed between Mrs. King and Mrs. Edenborn, the law would still not require Mrs. Edenborn to show by a preponderance of the evidence the *absence* of undue influence. In *Llewellyn's Estate*, 296 Pa. 74, 145 A. 810, this Court held that no confidential relation was established where the proponent of the will drew checks and paid bills and slept in the same room to attend to the decedent's wants at night during the last weeks of his illness. In *Barnard v. Kell*, 271 Pa. 80, 86, 113 A. 836, a conveyance was not set aside because of a supposed confidential relation where the grantee was the servant of the donor and the grantee's wife nursed the donor during his last illness.

Where there is no evidence of weakened intellect, the burden is upon those asserting undue influence to prove it, even where the bulk of the estate is left to one occupying a confidential relation. *Ash Will*, 351 Pa. 317, 41 A. 2d 620; *Phillips' Estate*, 244 Pa. 35, 44, 90 A. 457; *Lawrence's Estate*, 286 Pa. 58, 132 A. 786. Bodily weakness alone is not sufficient to shift the burden of proof upon the beneficiary occupying a con-

fidential relation to the testatrix, for one may be physically weak and yet have a perfectly sound and strong mind: *Keen's Estate,* 299 Pa. 430, 149 A. 737; *Phillips' Estate,* supra; *Llewellyn's Estate,* supra.

So long as the mind, like the captain of a stricken ship, is free to dictate direction and course, its decision will not be questioned in law even though the body be crippled with pain and the spirit awry with torment.

Nor is the burden of proof placed upon a legatee, in the case of a confidential relation, unless it be shown that he was instrumental in procuring the legacy. Where there is no evidence that the beneficiary solicited the bequest herself or wrote the will or procured it to be written, or that her advice was sought or taken, the existence of intimate friendly relations between the testatrix and beneficiary, such as living with her, nursing her and managing her business do not import undue influence or shift the burden of proof: *Messner v. Elliott,* 184 Pa. 41, 39 A. 46; *Miller v. Oestrich,* 157 Pa. 264, 27 A. 742; *Koons's Estate,* 293 Pa. 465, 143 A. 125; *Cookson's Estate,* 325 Pa. 81, 189 A. 904; *Llewellyn's Estate,* supra.

Undue influence of the kind which will affect the provisions of a will must be such as subjugates the mind of the testator to the will of the person operating upon it; and in order to establish this, proof must be made of some fraud practiced, some threats or misrepresentations made, some undue flattery, or some physical or moral coercion employed, as to destroy the free agency of the testator; and these influences must be proved to have operated as a present constraint at the very time of making the will: *Cressman Estate,* 346 Pa. 400, 31 A. 2d 109; *Geho's Estate,* 340 Pa. 412, 17 A. 2d 342; *Phillips' Estate,* supra; *Morrish Estate,* 156 Pa. Superior Ct. 394, 40 A. 2d 907. The record in this

case does not reveal any testimony which falls within any of these categories.

This Court has frequently indicated that the draftsman of a will, especially if he be a lawyer, is always an important and usually the most important witness in a contested will case and where, as here, he knew the testatrix prior to the execution of her will, since he had handled her husband's estate, his testimony showing voluntary and intelligent action by the testatrix, makes out a prima facie case that requires very strong evidence to offset it: *Kustus v. Hager,* 269 Pa. 103, 112 A. 45; *Kane's Estate,* 206 Pa. 204, 55 A. 917.

Appellant lays much stress on the fact that the decedent had made a different will prior to the time she came to live with the proponent, but as was stated in *Aggas v. Munnell,* supra, the fact that the testatrix changed her will in favor of one with whom she took up domicile is not material as showing undue influence, for a new will cannot be set aside merely because it departs from the old one.

Once proper execution of the will by Mrs. King was shown, there arose the presumption of testamentary capacity and lack of undue influence. The burden was then placed upon the contestants of producing compelling evidence in their effort to upset the will. Undue influence must be established by the manifest weight of the evidence; a mere balancing of proofs is not sufficient: *Ross Will,* 355 Pa. 112, 114, 49 A. 2d 392; *Olshefski's Estate,* 337 Pa. 420, 422, 11 A. 2d 487; *Wertheimer's Estate,* 286 Pa. 155, 160, 133 A. 144; *Grubbs v. McDonald,* 91 Pa. 236, 241.

What offends against an innate sense of justice, decency and fair play offends against good law. And if a testatrix rewards a benefactress who cared for her when her need was great and others passed her by, the

courts will not find her bequest offending against nature or against law.

We, therefore, find no error in the action of the court below and the Decree is affirmed.  Costs to be paid by appellants.