## McCaffrey Estate

*Stradley, Ronan, Stevens & Young, George S. Forde, Jr., John F. Thaete* and *Walter B. Gibbons,* for exceptants.

*Francis G. Wenzel* and *James R. Caiola,* contra.

SHOYER, J., November 10, 1966.—Must an 88 year

old testator, whose charitable intentions have existed in writing for at least 22 years, be deemed to have died intestate because he failed to reproduce or republish his carefully drawn six-page will, the original of which was stolen from his home seven years before? This is the fundamental issue presented to us by the exceptions, which were filed by various Catholic charities.

James J. McCaffrey, a retired plumber, died on March 16, 1961, in his 89th year. His sole surviving next of kin was a cousin, May E. Gelhaus, living in California. At her request, letters of administration were granted to Francis J. Kelly on April 4, 1961.

In the ensuing months, the administrator and his attorney made a thorough search among the possessions of decedent and found two testamentary writings in his old roll-top desk. One was a brief holographic document on a scrap of ruled paper dated "Dec. 29/39", which gave his entire estate "to Cardinal Dougherty to be distributed among Catholic institutions", principally seven organizations which he named.

The other writing, dated July 3, 1947, was a conformed carbon copy of a typewritten will prepared by his then attorney, Gerald A. Gleeson, now Judge Gleeson of court of common pleas no. 7. Miss Mary A. Scullin testified that she was the secretary who had typed the original, making the simultaneous carbon which she conformed after proper execution of the original by signing each of the six pages of the copy with slant marks "/s/" followed by decedent's name, and then she wrote "/s/ Gerald A. Gleeson" as the first subscribing witness and her own signature as the second subscribing witness.

This document, more detailed than its predecessor, distributed $44,000 in legacies among a score of Catholic charities, including six of the original seven, and

gave the residue, which approximates $265,000, to two named Catholic orphanages. The carbon copy was contained with a letter from attorney Gleeson dated January 5, 1954, in his stamped business envelope addressed to Mr. McCaffrey. The envelope had been opened and presumably read by decedent. This letter commenced as follows: "Dear Jim: In accordance with your request made in our conversation of January 1, 1954, I am enclosing herewith conformed office copy of your will dated July 3, 1947. I understand that the original of this will was lost a few weeks ago when your home was robbed and the safe wherein the original will was kept was taken out of your home by the robbers". Then followed suggestions as to making a new will and the necessity under our statute of its being executed 30 days or more prior to death to validate charitable bequests.

Cardinal Dougherty predeceased decedent. His present successor in office, Archbishop Krol, filed a petition with the register of wills to revoke the letters of administration granted Mr. Kelly and to admit to probate the 1939 holographic will. In his opinion, the register made reference to the 1947 document, but it was never formally offered for probate, it is not mentioned in his decree admitting the 1939 instrument to probate, and never was its validity as a will expressly ruled on by him.

An appeal to this court by Florence E. Gelhaus, daughter and administratrix of the deceased cousin who had died in 1964, was heard on the record before the register supplemented by additional testimony, pursuant to stipulation of the parties. Judge Saylor subsequently held that the formal revocatory clause in the 1947 document was effective to revoke the 1939 instrument, whereupon he sustained the appeal, set aside the probate of the 1939 will and ordered the register of wills to reinstate the letters of administra-

tion which he had previously granted to Francis J. Kelly.

To this order of Judge Saylor, exceptions have been filed by the Catholic charities, which appeared before the register to urge his acceptance of the 1939 instrument as the last valid expression of decedent's testamentary wishes. One of these charities, The Little Sisters of the Poor, now asks that the 1947 instrument be offered to the register of wills for probate. While no error can be charged to the learned hearing judge for failing to do what he was never asked to do, we are impressed with the obvious merit of this present request and will direct our attention to it.

Since probate is the prerogative of the register of wills under our practice (see Rockett Will, 348 Pa. 445, 448 (1944)), and we must not usurp his authority, our comments are here offered for his consideration, but are not to be taken as a mandate binding upon him. We are impelled to state, however, that it is our mature opinion, arrived at after careful deliberation, that insufficient consideration has been given thus far to probate of the 1947 instrument as a lost or spoliated will. The register, in his opinion, expressed regret that, because of technical statutory requirements relating to the probate and revocation of wills, he could not give effect to decedent's true testamentary intent. We find no such barrier. Legislative and judicial policy were well stated by Mr. Justice (later Chief Justice) Schaffer in Harrison's Estate, 316 Pa. 15, 16 (1934), as follows: "Wills differ from all other documents. By statute and judicial decision they are put in a class by themselves in order as far as possible to safeguard their integrity. One of the reasons for this is that the person most concerned about a will cannot come forward to defend it. Death has stilled his tongue. In the reports on the shelves of law libraries there are hundreds of cases in which fraudulent writ-

ings have been set up as valid testaments. Judges have had to take account of this; hence the endeavor to circumvent cupidity and cunning by hedging about the disposition which a man makes of his property by every reasonable safeguard which human foresight can bring to bear. This is a part of the broad public policy which society, represented by the State, announces through its tribunals, judicial and legislative, to increase the difficulties and hazards standing in the way of the would-be perpetrators of fraud".

While numerous States have provided a statutory remedy for lost wills, it seems that in this Commonwealth the legislature has preferred to let the courts solve this difficult problem and set up their own guidelines. Consequently, all law on this subject is judicial: see Foster's Appeal, 87 Pa. 67 (1878), and cases there cited in the opinions of the Supreme Court and the lower court. From earliest times, equity has given relief where a will has been lost or destroyed just as it did ordinarily in the case of lost instruments: 3 Bowe-Parker: Page on Wills §27.2. In Pennsylvania, the remedy has been applied by those same authorities as are expressly empowered to admit wills to probate. The leading cases were reviewed at length by our colleague, Judge Bolger, in his concurring opinion in Banks' Estate, 29 D. & C. 2d 241 (1963). Reference to these cases reveals that the courts have sought to set the degree of required proof at a height which would discourage the wrongdoer, but not defeat the rightful heir.

The requirements for proving a lost will are threefold. They may be stated as follows: (1) proof of execution by two witnesses, (2) proof of content, and (3) proof that the missing will was not destroyed by decedent animo revocandi.

Here there was adequate proof as to both (1) and (2). It is clear from the testimony of Judge Gleeson

and his then secretary, Mary A. Scullin, that the original of the 1947 will was duly executed. The judge stated:

". . . it was executed on the 3rd day of July, 1947 . . . yes, he executed the document", and that both he and Mary A. Scullin were witnesses thereon. "The conformed copy would be the carbon copy of the will . . ."; and ". . . it is a conformed copy of the original will". Mary A. Scullin stated conformation was all in her handwriting, that her signature thereon shows she actually signed the original, and that she would not have conformed the copy unless the original was signed and executed and she saw it. There is no doubt that the original was executed. That Mary A. Scullin had no independent recollection, and utilized the conformed copy to prove the execution, is of no great significance. In Miller v. Exeter Borough, 366 Pa. 336, the court stated: " '. . . but where he has no present recollection of such past event, even when aided by his memorandum, the latter itself may be offered in evidence on proof by the witness of his knowledge of its accuracy when made and that it was made when the transaction was fresh in his mind' ".

Here, the conformation was accurate and was made when the original will was before her right after its execution, and when everything was fresh in her mind. Her testimony under oath as to its accuracy when executed, and that her signature and handwriting were thereon, makes such conformed carbon copy admissible as independent, competent documentary evidence. Subscribing witnesses are not required to remember details; the certificate attesting their act ". . . may not only refresh their recollection but also may be used by them as substantive proof to establish validity": Lawrence's Estate, 286 Pa. 58, 63 (1926).

We now come to proof of the third requirement. When a will duly executed and known to have been

in testator's possession cannot be produced for probate following testator's death, there is a strong presumption that he himself destroyed all trace of it animo revocandi. It is a presumption based on the known fact that the reasons which motivate revocation are often private and testator, while living, does not wish to make his personal preferences or resentments a matter of public knowledge: Weber's Estate, 268 Pa. 7, 14 (1920); Deaves' Estate, 140 Pa. 242, 249 (1891); 3 Bowe-Parker: Page on Wills §27.5. The evidence required to overcome this presumption must be "clear and satisfactory": Michell v. Low, 213 Pa. 526, 533 (1906), or, as stated more recently, "positive, clear and satisfactory": Murray Will, 404 Pa. 120, 129 (1961).

The legislature, in section 5 of the Wills Act of April 24, 1947, P. L. 89, has clearly and concisely defined methods of revocation as follows: "No will or codicil in writing, or any part thereof, can be revoked or altered otherwise than:

"(1) Will or Codicil. By some other will or codicil in writing,

"(2) Other Writing. By some other writing declaring the same, executed and proved in the manner required of wills, or

"(3) Act to the Document. By being burnt, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revocation, by the testator himself or by another person in his presence and by his express direction. If such act is done by any person other than the testator, the direction of the testator must be proved by the oaths or affirmations of two competent witnesses".

It will be noted at once that revocation by physical destruction of the document, as stated in subsection (3), must be done animo revocandi "by the testator himself or by another acting in his presence and by

his express direction". These were the legislature's requirements when decedent's home was burglarized and the will stolen in 1953. Such statutory revocation could occur only in testator's lifetime. There is no reference in the statute to theft or fraudulent destruction by another, which would be just as hostile to decedent's interest whether occurring before or after his death. Ratification of an authorized act of destruction by another, not performed in testator's presence, is seemingly without legal effect and, therefore, null and void. Cf. Hunter's Estate, 328 Pa. 484 (1938), where testator's signature, added to his crossmark *but not in his presence*, was held invalid for purposes of execution. How then can a theft of the will be made the subject of *implied* ratification or adoption regardless of when knowledge of the loss comes to testator? Certainly there is here no legislative straitjacket from which the register of wills cannot extricate himself. Once the register accepts the theft of the will as a fact, then testator's obtaining of the conformed will from his attorney and his careful preservation of the same can scarcely be regarded as an act of revocation. *Destruction* of this *copy* by testator might be deemed positive ratification of the original's revocation by spoliation (cf. Kehr Will, 373 Pa. 473 (1953)), but certainly no such conclusion can attend its *retention*.

It must be acknowledged that burglary of one's home is a grievous and traumatic experience for any law-abiding citizen, and especially one who has reached the age of 82. When Sister Rose Brendan Clearkin wrote decedent on July 6, 1955, one of her deepest impressions retained from his earlier visit was his "worriment about the robbery". When she testified before the register, she could not remember the exact purpose of decedent's visit, nor any express statements he might have made about the present existence of a

will. In the light of the recent holding in Baum Estate, 418 Pa. 404, 409 (1965), that the carbon copy of a will "made at the same time, by the same typewriter and by the same strokes. . . ." is an *original*, it would seem that McCaffrey's then mental appraisal of his own status—viz., whether he remained presumptively testate—could be deemed equivocal, to say the least. And Mr. Kelly's telephone call to Judge Gleeson just a week before his death indicates decedent's dominant thought that he still possessed a valid will.

Certainly Deaves' Estate, supra, is not controlling of the present situation. There, decedent, apparently in vigorous health, met instant death when he fell from a farm wagon and broke his neck. For two years he had spoken of the loss of his will from a bureau drawer and frequently of his intention to make a new one. Our Supreme Court held that a presumption of revocation might "fairly be inferred" and refused to disturb the register's finding to that effect. However, the court voiced its strong suspicions that decedent had destroyed the will himself, preferring to die intestate, and in any event the proof of content was unsatisfactory. In view of decedent's neglect, added to the uncertainty of his actual intentions, equity did not require the court to produce a remedy. By the very language of its opinion, the holding of the court in Deaves must be limited to a situation where there is some doubt as to whether the will was actually lost, or whether it was destroyed animo revocandi.

In Roman Will, 80 N. J. Super. 481, 194 A. 2d 40 (1963), the facts presented another case of lost will by burglary of decedent's safe. The theft occurred some 10 months before testator's death on June 9, 1963. There was evidence that the will drawn in 1949 expressed decedent's testamentary intentions as they continued to exist up to the time of the theft, and there was no evidence of any contrary intention thereafter.

The court held that it was obvious there was no presumption of revocation by testator himself, and no presumption of adoption of the lost will as a revocation. Accordingly, the carbon copy of the will was admitted to probate.

When the register was considering the petition for probate of the 1939 paper, he lacked the advantage of the concrete evidence of the burglary, which was later proven so emphatically before Judge Saylor that all counsel stipulated its occurrence on December 4, 1953, as a fact. In addition, Baum Estate, supra, was not handed down until after the register had decided that the 1939 McCaffrey will was not affected by execution of the 1947 instrument. Our Supreme Court decided in Baum that a nonconformed carbon copy of a revoked typewritten will was sufficient proof of testator's preexisting charitable intent to uphold "identical" gifts repeated in a later will. This decision establishes that the cautionary suggestions in attorney Gleeson's letter as to charitable bequests were unnecessary and erroneous.

Our Supreme Court has stated that, upon a petition to probate a lost will, testator's character, his tenacity of purpose, his condition, his acts and his declarations are all proper subjects of inquiry by proponents seeking to overcome the presumption of revocation: Gardner's Estate, 164 Pa. 420 (1894). To the record which we have reviewed in this opinion, proponents may, of course, add additional evidence when they apply to the register of wills for probate of the 1947 document.

Accordingly, with the concurrence of the learned hearing judge, exception no. 9, filed by The Little Sisters of the Poor of the City and County of Philadelphia, is sustained. All other exceptions are dismissed without prejudice. The decree of the register admitting the instrument of December 29, 1939, to probate is opened. The record is now remanded to the register

of wills in order that The Little Sisters of the Poor, and such other named beneficiaries as care to join with them, may offer the conformed copy of decedent's July 3, 1947, will for probate.