## Estate of Elizabeth Del Rossi

C.P. of Montgomery County, no. 94-1525.

*James F. Mannion,* for Philadelphia Orchestra Association.

*Joseph L. Loughran* and *Margaret L. Hutchinson* for Rosalie Manfredi, Carmella Della Penna and Thomas Manfredi.

*Lawrence Barth, deputy attorney general,* for the Commonwealth

*G. Thomas Williams,* for Emily Shook.

OTT, *J.,* March 24, 1995—The decedent, Elizabeth Del Rossi, died July 31, 1992, a resident of Wyncote, Montgomery County. On October 14, 1993, Emily Spencer Shook petitioned the Montgomery County Register of Wills to probate a photocopy of an original will executed April 8, 1989. On November 5, 1993, Rosalie Manfredi, a niece of the decedent, who, along with another niece and nephew, were named beneficiaries in a will executed on March 29, 1971, filed a response opposing the admission to probate of the 1989 will. The Philadelphia Orchestra Association, as sole residuary beneficiary under the 1989 will, filed a joinder in support of Ms. Shook's petition on December 27, 1993.

The register held a hearing on February 8, 1994, and by order dated May 24, 1994, denied the petition. In an accompanying opinion, the register explained that proof of the execution of the original will had been presented by the two subscribing witnesses and no presumption of revocation of the original will arose because the decedent did not have custody of her will at any time after execution. Nevertheless, the register concluded that the contents of the original will had not been substantially proven by two competent witnesses pursuant to Pennsylvania's so-called "two-witness rule." *Hodgson's Estate,* 270 Pa. 210, 112 A. 778 (1921); *Hock v. Hock,* 6 S.&R. 47 (1820).

On June 21, 1994, the Orchestra and the Commonwealth of Pennsylvania, Office of Attorney General, as parens patriae for charities, appealed the denial of the petition to probate the 1989 will. The beneficiaries named in the 1971 will filed a response with new matter,

which raised a challenge to the decedent's testamentary capacity on April 8, 1989. Pursuant to the appeal, a de novo hearing was held before the undersigned on November 11, 1994, at which five witnesses testified. No material facts are in dispute and those which are pertinent follow.

Louis S. Croce, Esquire, a licensed Pennsylvania attorney since 1966, testified to first meeting the decedent at a real estate settlement he handled for her and her sister, Lenore. Emily Shook, a good friend of the decedent, testified Ms. Del Rossi repeatedly told her, after the death of Lenore on March 17, 1989, that she wanted to change her will. As a result, Ms. Shook contacted Mr. Croce and asked him to see the decedent for the purpose of drafting her a new will. Thereafter, Mr. Croce met with the decedent three times in connection with drafting and executing the subject will. All three meetings took place at the Wyncote Church Home where the decedent was then residing. At the first meeting, Mr. Croce satisfied himself that the decedent was competent. He recalled she spoke of her love of music and the fact that most of the happiness in her life revolved around music. She said that she was angry at her family and felt they were not concerned about her, only her money. She also expressed her displeasure at being placed in the Wyncote Church Home. She directed Mr. Croce to prepare a will leaving her entire estate to the Orchestra.

Mr. Croce's wife, who was present during her husband's first meeting with the decedent, typed a will draft which was complete except for the designation of an executor. During the second meeting between Mr. Croce and the decedent, this subject was discussed, and she directed him to complete the will by designating Emily Shook as executrix. After Mrs. Croce retyped

the will as instructed, the third meeting took place on April 9, 1989. Mr. Croce testified that he first had the decedent read the will aloud to him to make sure she understood it. The will was then signed in his presence as well as that of Jacob Shook (Emily's husband), both of whom signed as subscribing witnesses in the presence of the decedent. Mrs. Croce testified that although she had not been present when the decedent signed her will, she had no doubt that the proffered will was an exact photocopy of the will she had retyped for the decedent's execution.

Mr. Croce agreed to maintain custody of the original will after the signing because the decedent had expressed to him her concern about lacking a safe place to put it. The will remained in his file from April 8, 1989 through February 24, 1992, at which time he sent it with a cover letter to Emily Shook. The letter explained Mr. Croce had just changed employers and he no longer felt comfortable maintaining the will.

Jacob and Emily Shook both testified and confirmed Mr. Croce's testimony. Specifically, Mr. Shook related that he witnessed the decedent execute her will in the presence of Mr. Croce and both he and Mr. Croce signed as subscribing witnesses in the presence of the decedent. Mr. Shook acknowledged he did not read the will at the time it was executed, however, he had spoken with the decedent on prior occasions about her unhappiness toward her family, her sense of abandonment, and her desire to leave her entire estate to the Orchestra. Ms. Shook testified that she, too, was present when the decedent executed her will and when her husband and Mr. Croce signed as subscribing witnesses. Although she said she did not read the will, she related that the decedent told her that day that her will left everything to the Philadelphia Orchestra and that she had been named executrix.

Both Mr. and Mrs. Shook confirmed that they received the original will from Attorney Croce within days of February 24, 1992. Upon receiving it, they read it and each remembers that the will left the entire estate to the Orchestra. Ms. Shook put the will in a desk drawer in her house where it remained until after the decedent died. After Ms. Del Rossi's death, Ms. Shook contacted the decedent's niece, Rosalie Manfredi and told her of the will. In response to Ms. Manfredi's request that she send her the will or a copy, Ms. Shook sent the original by regular first class mail addressed to Ms. Manfredi at Unit 450 of her condominium complex in Philadelphia. Prior to doing so, Mr. Shook made a copy of the will on his fax machine. He then made several photocopies from the fax copy. Both of the Shooks confirmed that the copies they retained, one of which was offered for probate, were exact copies of the original that was sent to Ms. Manfredi. Ms. Shook explained that she sent the original will to Ms. Manfredi because she had held Ms. Del Rossi's power of attorney, Ms. Shook trusted Ms. Manfredi, and she assumed that the two of them would be working together. Ms. Shook added she was not aware that as executrix she had sole responsibility for filing the will of record.

Rosalie Manfredi's correct unit number was 540. Consequently, the original will never reached her, and cannot now be located. Ms. Manfredi acknowledged that the signatures on the photocopy of the will were those of her aunt. Nevertheless, she insisted she had never seen the original will and had never received it.

At the conclusion of the hearing, the Orchestra made a motion for compulsory nonsuit as to the respondents' claim that the decedent lacked testamentary capacity to execute the subject will. Inasmuch as the respondents had the burden in that regard and no evidence had

been presented from which a challenge to capacity could be sustained, we granted the motion for nonsuit. Thereafter, the court announced that it was satisfied beyond all doubt that the proffered instrument represented an exact photocopy of a will executed by the decedent on April 8, 1989. The case was thereby reduced to the single issue of whether the method and manner of proof as to the contents of the will satisfied Pennsylvania law. Pursuant to our invitation, the parties submitted excellent briefs on this issue and the matter is now ready for determination.

In order to probate a copy of a "lost" will, the proponent of a copy must prove: (1) The testator duly and properly executed the original will; (2) The contents of the will were substantially the same as appears on the instrument presented for probate; and (3) The testator had not destroyed or revoked the will prior to death. *Murray Will,* 404 Pa. 120, 171 A.2d 171 (1961); *Burns v. Kabboul,* 407 Pa. Super. 289, 595 A.2d 1153 (1991); *In re Estate of Keiser,* 385 Pa. Super. 24, 560 A.2d 148 (1989).

Both the first element relating to execution and the second relating to contents must be proven by the testimony of at least two witnesses. *Harrison's Estate,* 316 Pa. 15, 173 A. 407 (1934). The rationale underlying the so-called "two-witness rule" was explained by Pennsylvania's Supreme Court in *Hodgson's Estate,* 270 Pa. at 215:

"The two-witness rule is sound; by permitting one witness to establish the contents of a lost will, the door would be opened to intriguing and designing persons, after which misfortune must necessarily follow; and, while, by such latter rule, a disappointed heir may be discouraged from destroying a will, dishonesty, fraud and criminal wrong would be greatly encouraged. If

a will, properly executed, is lost, and the one-witness rule should prevail, it would permit a scrivener to write the will after his own fashion, diverting the estate into channels never dreamed of by the testator, disinheriting heirs, and denying, to those close to him throughout life, the benefits of his bounty. Where two witnesses to the contents are required, the opportunity for engrafting bogus wills on estates, or for dishonesty in scriveners who write wills, or other fraud in connection therewith, if not made impossible, is greatly lessened. Under this rule, when the disappointed heir destroys a will and two witnesses to prove contents are not available, the law, in such cases, writes an excellent will for the decedent, giving the estate to those, by nature and by presumption, nearest and dearest to the decedent. No instrument coming before the court for determination is guarded more jealously than the will of one who is no longer able to voice his wishes."

Respondents concede the Orchestra proved that the will was validly executed and remained undestroyed and unrevoked by decedent prior to her death. They insist, however, that the Orchestra's proof failed to meet the two-witness test with respect to the contents of the will. They point out that Attorney Croce was the only witness able to testify directly that the contents of the will executed by decedent on April 8, 1989, were identical to those of the photocopy submitted for probate. They suggest that, however strong the Orchestra's supporting testimony was, it was strictly circumstantial and, thus, insufficient. In this regard, they point to *Harrison's Estate, supra,* where the Supreme Court said: "[W]e are of opinion that circumstances may not supply the lack of another witness. ... Circumstances cannot take the place of the second witness to a will which is produced. They cannot legally or safely be permitted to do so in the case of a will which is not produced." 316 Pa. at 17-18.

Respondents' position rests upon an assumption that the two witnesses had to have been familiar with the contents of the will at the time of its execution. Respondents have offered no authority to support this position and our own research has failed to reveal any. Mr. and Mrs. Shook both read the original will when they received it from Mr. Croce in February of 1992. Both testified that the proffered copy is an exact photocopy of the original will they received. Moreover, Kay Croce opined that the proffered will was an exact photocopy of that which she typed for the decedent's execution. We believe the testimony of these three credible and disinterested witnesses, along with the unrefuted testimony of Attorney Croce, independently proves the contents of the original will, and satisfies the two-witness rule.

There is appellate authority that supports our conclusion. In *Glockner v. Glockner,* 263 Pa. 393, 106 A. 731 (1919), only parol evidence was offered to prove the contents of a lost will; no copy existed, nor was a reproduction prepared. The original will was holographic and signed by the decedent but not witnessed. After execution, the unwitnessed will was seen by two persons, one on the day it purportedly was written and the other some six weeks later. The court determined the testimony of the two witnesses was sufficient to prove both execution and contents.

"The proof of the contents of the will is also ample to sustain the verdict. The witnesses who saw and read it agreed in their statements regarding its provisions. In addition to this we have the corroborating testimony of the testator's declarations as to the manner in which he had distributed his property.... These declarations were competent evidence..., and the testimony as a whole is ample to sustain the verdict." 263 Pa. at 396-397. (citations omitted)

If, as *Glockner* held, contents can be proven through witnesses whose observations occurred after the will was executed, the amount of time which transpires between execution and observation goes to the weight, not the competence of the testimony. Although the Shooks' reading of the will occurred almost three years after its execution, the circumstances described through credible testimony suggest the weight of the Shooks' testimony has not been compromised.

Notwithstanding our belief that the Orchestra has proven the contents of decedent's original will by two or more witnesses, we are not convinced it had to. It should not be forgotten that the second of the three elements under *Murray Will, supra,* requires proof that the contents of the original will were "substantially" as appears on the exact photocopy proffered for probate. We believe the respondents have strained to stretch case law applicable only where the contents of a lost will are proven by parol evidence—the so-called "two-witness rule." But this case is significantly different from any other reported lost will case. Here, the Orchestra proved the contents of the original will initially, not by parol evidence, but by an exact photocopy of the decedent's completely executed original will. We conclude that when the contents of a lost will are proved in this manner, the proponent need only meet the statutory requirements of section 3132 of the Probate, Estates and Fiduciaries Code to be entitled to probate the photocopy.

We agree with the Orchestra's position that to place the two-witness rule into proper perspective, we must first consider the statutory requirements for probating an original will. To this end, section 3132 of the PEF Code mandates that all wills "shall be proved by the oaths or affirmations of two competent witnesses...." Subscribing witnesses are not required to read a will

before signing. *Lawrence's Estate,* 286 Pa. 58, 132 A. 786 (1926); *White's Estate,* 262 Pa. 356, 105 A. 549 (1918); *Lillibridge's Estate,* 221 Pa. 5, 69 A. 1121 (1908). To the contrary, the practice is otherwise. Indeed, witnesses do not need to know that the document they are signing is a will. *Lillibridge's Estate, supra.* Lastly, section 3132(1) of the PEF Code provides that an un-witnessed will may still be probated if two witnesses identify the testator's signature.

The foregoing demonstrates that the two-witness rule, first enunciated in *Hock v. Hock, supra,* with respect to proof of execution and later expanded to proof of contents in *Hodgson's Estate, supra,* arises directly from the statutory requirement that all wills, including lost wills, shall be proved by the oaths or affirmations of two competent witnesses.

"When [a will is] made according to the requirements of the statute, it ought, after [the] testator's death to be carried into effect; still, when offered for probate, the will, or its substance, must measure up to the re-quirements fixed by laws; and here the legislature has laid its hand on the subject and directed the judicial course." *Hodgson's Estate,* 270 Pa. at 215.

The language "requirements fixed by laws" is a clear reference to section 2 of the Wills Act of 1917, a near-identical predecessor to current PEF Code §3132. There were and are no separate statutory provisions applicable only to lost wills. Accordingly, the bottom line is that a lost will cannot be proven in a way an original could not be *(i.e.,* with fewer than two witnesses). But it is equally clear that the law does not impose additional re-quirements upon lost wills which are not found in the statutory requirements for probating original wills. Given this perspective, the exact photocopy proffered by the

Philadelphia Orchestra clearly satisfied the requirements of PEF Code §3132.

We have no doubt that the two-witness rule remains viable where a proponent attempts to prove the contents of a lost will by parol evidence. Virtually all of the reported lost will cases are of this variety, decided before the photocopy machine was integrated into the daily practice of law. We agree with the Orchestra's position that the best possible evidence of a lost will's contents is a properly authenticated photocopy. It is certainly more reliable than any witness's memory. Here, although the original will is no longer available, there was ample testimony by disinterested, credible witnesses that exact photocopies were made of the original executed will. All signatures on the photocopy have been authenticated and there is much corroborating testimony that the will is consistent with the express desires and directions of the testatrix. Under these circumstances, we can conceive of no better proof but for the executed original. If any copy of a lost will is entitled to probate, the one offered here must be. Accordingly, we will enter the following.

## ORDER

And now, March 24, 1995, the appeal of the Philadelphia Orchestra Association and the Attorney General of Pennsylvania, as parens patriae for charities, from the order of the Register of Wills of Montgomery County dated May 24, 1994, is sustained and the register is directed to accept the proffered photocopy of the will dated April 8, 1989, for probate.