## Pavlinko Will.

Argued October 3, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES and COHEN, JJ.

reargument refused March 5, 1959.

*Ralph C. Davis,* with him *Gregory Zatkovich,* for appellant.

*Francis Taptich,* for appellee.

OPINION BY MR. JUSTICE BELL, January 15, 1959:

Vasil Pavlinko died February 8, 1957; his wife, Hellen, died October 15, 1951. A testamentary writing dated March 9, 1949, which purported to be the will of Hellen Pavlinko, was signed by Vasil Pavlinko, her husband. The residuary legatee named therein, a brother of Hellen, offered the writing for probate as the will of Vasil Pavlinko, but probate was refused.

The orphans' court, after hearing and argument, affirmed the decision of the register of wills.

The facts are unusual and the result very unfortunate. Vasil Pavlinko and Hellen, his wife, retained a lawyer to draw their wills and wished to leave their property to each other. By mistake Hellen signed the will which was prepared for her husband, and Vasil signed the will which was prepared for his wife, each instrument being signed at the end thereof. The lawyer who drew the will and his secretary, Dorothy Zinkham, both signed as witnesses. Miss Zinkham admitted that she was unable to speak the language of Vasil and Hellen, and that no conversation took place between them. The wills were kept by Vasil and Hellen. For some undisclosed reason, Hellen's will was never offered for probate at her death; in this case it was offered merely as an exhibit.

The instrument which was offered for probate was short. It stated:

"I, *Hellen* Pavlinko, of . . ., do hereby make, publish and declare this to be *my** Last Will and Testament, . . ."

In the first paragraph she directed her executor to pay her debts and funeral expenses. In the second paragraph she gave her entire residuary estate to "my husband, Vasil Pavlinko . . . absolutely".

She then provided: "Third: If my aforesaid husband, Vasil Pavlinko, should predecease me, then and in that event, I give and bequeath: (a) To my brother-in-law, Mike Pavlinko, of McKees Rocks, Pennsylvania, the sum of Two hundred ($200.00) Dollars. (b) To my sister-in-law, Maria Gerber, (nee Pavlinko), of Pittsburgh, Pennsylvania, the sum of Two hundred ($200.00) Dollars. (c) The rest, residue and remain-

---

* Italics throughout, ours.

der of *my* estate, of whatsoever kind and nature and wheresoever situate, I give, devise and bequeath, absolutely, to *my brother,* Elias Martin, now residing at 520 Aidyl Avenue, Pittsburgh, Pennsylvania.

"I do hereby nominate, constitute and appoint my husband, Vasil Pavlinko, as Executor of this my Last Will and Testament." It was then mistakenly signed: "Vasil Pavlinko [Seal]".

While no attempt was made to probate, as Vasil's will, the writing which purported to be his will but was signed by Hellen, it could not have been probated as Vasil's will, because it was not signed by him at the end thereof.

The Wills Act of 1947 provides in clear, plain and unmistakable language in §2: "Every will shall be in writing and shall be signed *by the testator* at the end thereof" with certain exceptions not here relevant. The court below correctly held that the paper which *recited* that it was the will of Hellen Pavlinko and intended and purported to give Hellen's estate to her husband, could not be probated as the will of Vasil and was a nullity.

In order to decide in favor of the residuary legatee, almost the entire will would have to be rewritten. The court would have to substitute the words "Vasil Pavlinko" for "Hellen Pavlinko" and the words "my wife" wherever the words "my husband" appear in the will, and the relationship of the contingent residuary legatees would likewise have to be changed. To consider this paper—as written—as Vasil's will, it would give his entire residuary estate to "my husband, Vasil Pavlinko, absolutely" and "Third: If my husband, Vasil Pavlinko, should predecease me, then . . . I give and bequeath my residuary estate to my brother, Elias Martin." The language of this writing, which is signed at the end thereof by *Vasil* Pavlinko, is unambiguous,

clear and unmistakable, and it is obvious that it is a meaningless nullity.

While no authority is needed to demonstrate what is so obvious, there is a case which is directly in point and holds that such a writing cannot be probated as the will of Vasil Pavlinko. This exact situation arose in *Alter's Appeal*, 67 Pa. 341. The facts are recited in the unanimous opinion of the Court, speaking through Mr. Justice AGNEW (page 344) : "This is a hard case, but it seems to be without a remedy. An aged couple, husband and wife, having no lineal descendants, and each owning property, determined to make their wills in favor of each other, so that the survivor should have all they possessed. Their wills were drawn precisely alike, mutatis mutandis, and laid down on a table for execution. Each signed a paper, which was duly witnessed by three subscribing witnesses, and the papers were enclosed in separate envelopes, endorsed and sealed up. After the death of George A. Alter, the envelopes were opened and it was found that each had by mistake signed the will of the other. To remedy this error the legislature, by an Act approved the 23rd day of February 1870, conferred authority upon the Register's Court of this county to take proof of the mistake, and proceed as a court of chancery, to reform the will of George A. Alter and decree accordingly. . . . Was the paper signed by George A. Alter his will? Was it capable of being reformed by the Register's Court? The paper drawn up for his will was not a will in law, for it was not 'signed by him at the end thereof,' as the Wills Act requires. *The paper he signed was not his will, for it was drawn up for the will of his wife and gave the property to himself. It was insensible and absurd.* It is clear, therefore, that he had executed no will, and there was nothing to be reformed. There was a mistake, it is true, but that mis-

take was the same as if he had signed a blank sheet of paper. He had written his name, but not to his will. He had never signed his will, and the signature where it was, was the same as if he had not written it at all. He therefore died intestate, and his property descended as at law." The Court further decided that the Legislative Act was void because it had no power to divest estates which were already vested at law on the death of George A. Alter without a will.

How firmly and without exception the courts have carried out the provisions of the Wills Act, when the language thereof is clear and unmistakable, is further evident from the following authorities: *Bryen's Estate,* 328 Pa. 122, 195 A. 17; *Churchill's Estate,* 260 Pa. 94, 103 A. 533; *Gray Will,* 365 Pa. 411, 76 A. 2d 169.

In *Bryen's Estate,* 328 Pa., supra, a testator received from his lawyer a three page will. He wished to add an additional clause providing for a grandchild. The lawyer thereupon rewrote the last page "backed and bound together with brass eyelets the first, second and new third page, unnumbered, and inserted the original third page loosely between the last of the fastened pages and the backer." Bryen executed the loose sheet at the end thereof in the presence of two subscribing witnesses. He then placed the enclosure in his safe deposit box where it was found after his death. The Court held that the instrument could not be probated as Bryen's last will because it was not signed at the end thereof in conformity with the statute, nor could any part or pages thereof be probated as his last will. This Court, speaking through Mr. Justice, later Chief Justice, STERN, said (page 128): "The obvious truth of the matter is that the loose sheet was signed by mistake, . . . . While decedent's mistake is regrettable, it cannot be judicially corrected; the situation thus created must be accepted as it exists: Alter's Appeal, 67

Pa. 341. The question is not what a testator mistakenly thinks he is doing, but what he actually does: Churchill's Estate, 260 Pa. 94, 100; Dietterich's Estate, 127 Pa. Superior Ct. 315, 322, 323. It is of paramount importance to uphold the legal requirements as to the execution of wills, so that the possibility of fraud may be reduced to a minimum."

In *Churchill's Estate*, 260 Pa. 94, 103 A. 533, the Court refused to probate Churchill's will, which was written by him. He failed to sign his name "at what was so clearly the end of the paper as a will. What he did do was to write his name in three blank spaces in the paper—first at the top and then in the testimonium and attestation clauses. . . . he said to one of the two attesting witnesses, 'This is my will, I have signed it,' and to the other, 'I wish you to witness my name to a paper,' and subsequently handed it to a physician, saying, "This is my will, and I want you to keep it for me,' . . .

"The decedent may have thought he had made a will, but the statute says he had not. The question is not one of his intention, but of what he actually did, or rather what he failed to do. He failed to sign the paper at the end thereof, and this essential requirement of the statute is not met by the insertion of his name in his own handwriting in three blank spaces in the printed form of the paper which he may have intended to use in executing his will. 'It may happen, even frequently, that genuine wills, namely, wills truly expressing the intentions of the testators, are made without observations of the required forms; and whenever that happens, the genuine intention is frustrated by the act of the legislature, of which the general object is to give effect to the intention. The courts must consider that the legislature, having regard to all probable circumstances, has thought it best, and has therefore deter-

mined, to run the risk of frustrating the intention some-times, in preference to the risk of giving effect to or facilitating the formation of spurious wills, by the absence of forms. . . . 'Our Act of 1833 as well as the statute of Vict. are in part borrowed from the British statute of frauds, two sections of which have been so evaded by judicial construction as to be practically repealed. We do not propose that the Act of 1833 shall meet with the same fate. The legislature have laid down a rule so plain that it cannot be evaded without a clear violation of its terms. No room is left for judicial construction or interpretation. It says a will must be signed at the end thereof, and that's the end of it. We are of opinion that this paper was not a will within the meaning of the Act of 1833, and that it was error to admit it to probate.' "

In *Gray Will*, 365 Pa. 411, 76 A. 2d 169, testatrix signed her will "Mrs. Ella X (her mark) Gray. Witness: Fannie Graff." Mrs. Anderson was also present and saw Mrs. Gray make her mark, but did not sign her name on the paper as a subscribing witness. The Court said (pages 414-415) : "The first question that arises is, was this writing of January 22, 1946, a will and if so, was it probatable as such? The learned trial judge found and we agree that this writing was testamentary in character: Davis's Estate, 275 Pa. 126, 118 A. 645; Kimmel's Estate, 276 Pa. 435, 123 A. 405; Wenz's Estate, 345 Pa. 393, 29 A. 2d 13. It is however equally clear that even if it be a will, *it is not a valid or probatable will.* Section 2, sub-section 2 of the Wills Act of April 24, 1947, P. L. 89 provides: 'If the testator is unable to sign his name for any reason, a will to which he makes his mark and to which his name is subscribed in his presence before or after he makes his mark, shall be as valid as though he had signed his name thereto: Provided, He makes his mark in the

presence of two witnesses who sign their names to the will in his presence'."

This Court held that the instrument did not comply with §2 of the Wills Act of 1947 and could not be probated as Mrs. Gray's will.

Once a court starts to ignore or alter or rewrite or make exceptions to clear, plain and unmistakable provisions of the Wills Act in order to accomplish equity and justice in that particular case, the Wills Act will become a meaningless, although well intentioned, scrap of paper, and the door will be opened wide to countless fraudulent claims which the Act successfully bars.

Decree affirmed. Each party shall pay their respective costs.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Vasil Pavlinko and his wife, Hellen Pavlinko, being unlettered in English and unlearned in the ways of the law, wisely decided to have an attorney draw up their wills, since they were both approaching the age when reflecting persons must give thought to that voyage from which there is no return. They explained to the attorney, whose services they sought, that he should draw two wills which would state that when either of the partners had sailed away, the one remaining ashore would become the owner of the property of the departing voyager. Vasil Pavlinko knew but little English. However, his lawyer, fortunately, was well versed in his clients' native language, known as Little Russian or Carpathian. The attorney thus discussed the whole matter with his two visitors in their language. He then dictated appropriate wills to his stenographer in English and then, after they had been transcribed, he translated the documents, paragraph by paragraph, to Mr. and Mrs. Pavlinko, who approved of all that he had

written. The wills were laid before them and each signed the document purporting to be his or her will. The attorney gave Mrs. Pavlinko the paper she had signed and handed to her husband the paper he had signed. In accordance with customs they had brought with them from the old country, Mrs. Pavlinko turned her paper over to her husband. It did not matter, however, who held the papers since they were complementary of each other. Mrs. Pavlinko left her property to Mr. Pavlinko and Mr. Pavlinko left his property to Mrs. Pavlinko. They also agreed on a common residuary legatee, Elias Martin, the brother of Mrs. Pavlinko.

Mrs. Pavlinko died first, but for some reason her will was not probated. Then Mr. Pavlinko died and Elias Martin came forth to claim his inheritance. The Register of Wills of Allegheny County refused to accept the Vasil Pavlinko will for probate. It now developed for the first time that, despite every care used by her attorney, a strange thing had happened. Mr. Pavlinko had signed his wife's will and Mrs. Pavlinko had signed her husband's will.

At the hearing before the register of wills, the will signed by Vasil Pavlinko was introduced as Exhibit No. 1 and the will signed by Hellen Pavlinko was introduced as Exhibit No. 2. The attorney, who had drawn the wills and had witnessed the signatures of the testator and testatrix, testified to what had occurred in his office; his secretary who had typed the wills and had witnessed the signatures, also testified to the events which spelled out the little mishap of the unintentional exchange of the wills.

The Orphans' Court of Allegheny County sustained the action of the register of wills. Elias Martin appealed to this Court, which now affirms the lower court and, in doing so, I submit, creates another enigma for the layman to ponder over, regarding the mysterious

manner in which the law operates, its wonders to perform. Everyone in this case admits that a mistake was made: an honest, innocent, unambiguous, simple mistake, the innocent, drowsy mistake of a man who sleeps all day and, on awakening, accepts the sunset for the dawn.

Nothing is more common to mankind than mistakes. Volumes, even libraries have been written on mistakes: mistakes of law and mistakes of fact. In every phase of life, mistakes occur and there are but few people who will not attempt to lend a helping hand to the person who mistakes a step for a landing and falls, or the one who mistakes a nut for a grape and chokes, or the one who steps through a glass so clear that he does not see it. This Court, however, says that it can do nothing for the victim of the mistake in this case, a mistake which was caused through no fault of his own, nor of his intended benefactors.

Next to the love which the Pavlinkos bore to each other, they were devoted to Mrs. Pavlinko's brother, Elias Martin. They wholeheartedly agreed that after they had quitted the earth, this devoted kinsman of theirs should have all that they would leave behind them. No one disputes this brute fact, no one can dispute this granitic, unbudgeable truth. Cannot the law, therefore, dedicated as it is to the truth, and with all its wisdom and majestic power, correct this mistake which cries out for correction? May the law not untie the loose knot of error which begs to be freed? I know that the law is founded on precedent and in many ways we are bound by the dead hand of the past. But even, with obeisance to precedent, I still do not believe that the medicine of the law is incapable of curing the simple ailment here which has not, because of any passage of time, become aggravated by complications.

We have said more times than there are tombstones in the cemetery where the Pavlinkos lie buried, that the primary rule to be followed in the interpretations of a will is to ascertain the intention of the testator. Can anyone go to the graves of the Pavlinkos and say that we do not know what they meant? They said in English and in Carpathian that they wanted their property to go to Elias Martin.

We have also said time without number that the intent of the testator must be gathered from the four corners of his will. Whether it be from the four corners of the will signed by Vasil Pavlinko or whether from the eight corners of the wills signed by Vasil and Hellen Pavlinko, all set out before the court below, the net result is always the same, namely that the residue of the property of the last surviving member of the Pavlinko couple was to go to Elias Martin. In the face of all the pronouncements of the law as to the fidelity with which the intention of the testator must be followed, on what possible basis can we now ignore the intention expressed by the Pavlinkos so clearly, so conclusively, and so all-encompassingly?

The Majority says that there is nothing we can do to effectuate the expressed intention of Vasil Pavlinko. But, I respectfully submit, the Majority does not make a serious effort to effectuate that expressed intent. The Majority contents itself with saying that "the facts are unusual and the result very unfortunate." But the results do not need to be unfortunate. In *King Will,* 369 Pa. 523, 531, we said that: "What offends against an innate sense of justice, decency and fair play offends against good law." Certainly the results being affirmed by this Court offend against an innate sense of justice. Elias Martin is being turned out of court when there is no need for such a peremptory eviction. The Majority authorizes the eviction on the basis of a decision

rendered by this Court in 1878 in the case of *Alter's Appeal,* 67 Pa. 341. There, wife and husband, also signed wrong papers and the Court in that post-Civil War period, held nothing could be done to correct the error. But even if we say that the *Alter* decision makes impossible the transferring of the signatures of Vasil Pavlinko to the will written in his name, I still do not see how it prevents this Court from enforcing the provision in the will which *was* signed by Vasil Pavlinko. In the *Alter* case an attempt was made to reform the will "by striking off the signature 'Catherine Alter,' and causing the name 'George A. Alter' to be signed thereto" so that the paper so signed could be "admitted to probate as the will of George A. Alter." But in our case here, no such substitution is being sought. What Elias Martin seeks is admission to probate of a testamentary writing *actually signed by the testator Vasil Pavlinko.*

Moreover, in the *Alter* case, as distinguished from the Pavlinko will, George A. Alter left everything to himself. Even if we accept the Majority's conclusion, based on the *Alter* case, that all provisions in the Pavlinko will, which refer to himself, must be regarded as nullities, not correctible by parol evidence because they evince no latent ambiguities, it does not follow that the residuary clause must perish. The fact that some of the provisions in the Pavlinko will cannot be executed does not strike down the residuary clause, which is meaningful and stands on its own two feet.* We know that one of the very purposes of a residuary clause is to provide a catch-all for undisposed-of or ineffectually disposed-of property. "A residuary gift carries with it, and is presumed to have been so intended,

---

* Where two provisions in a will conflict, the latter controls. *Conner's Estate,* 302 Pa. 534.

not only all the estate which remains not specifically disposed of at the time the will is executed, *but all that, for any reason, which is illy disposed of, or fails as to the legatees originally intended*: Wood's Est., 209 Pa. 16." (*Jull Estate*, 370 Pa. 434, 442.) (Emphasis supplied)

And the Wills Act itself specifically provides: "A devise or bequest not being part of the residuary estate which shall fail or be void because the beneficiary fails to survive the testator or because it is contrary to law *or otherwise incapable of taking effect*, or which has been revoked by the testator or is undisposed of, or is released or disclaimed by the beneficiary, if it shall not pass to the issue of the beneficiary under the provisions provided for by law, shall be included in the residuary devise or bequest if any contained in the will." (Emphasis supplied).

The Majority also relies on *Bryen's Estate*, 328 Pa. 122, but in that case the testator failed to sign the prepared will at the end. He affixed his signature to a page which was "in effect nothing more than a detached and independent paper not sequentially integrated with the others to form with them a testamentary instrument." But here, I repeat, there was a complete testamentary instrument signed by Vasil Pavlinko at the end thereof and with testamentary intent.

The Majority calls upon *Churchill's Estate*, 260 Pa. 94, as further substantiation of its position, but the testator in that case failed to sign the testamentary writing at the end.

And, so far as *Gray Will*, 365 Pa. 411, additionally cited by the Majority, is concerned, it clearly is not applicable to the facts in the case at bar because, there, the mark of the testator was not made in accordance with the provisions of the Wills Act.

I see no insuperable obstacle to probating the will signed by Vasil Pavlinko. Even though it was originally prepared as the will of his wife, Hellen, he did adopt its testamentary provisions as his own. Some of its provisions are not effective but their ineffectuality in no way bars the legality and validity of the residuary clause which is complete in itself. I would, therefore, probate the paper signed by Vasil Pavlinko. Here, indeed, is a situation where we could, if we wished, consistent with authority and precedent, and without endangering the integrity of the Wills Act, put into effect the time-honored proverb that "where there's a will, there's a way."

In fact, we have here two wills, with proper signposts unerringly pointing to the just and proper destination, but the Court still cannot find the way.